23-5077 United States v. Little Good morning, may it please the court. Kristen Thayer for Appellant Justin Little. I'd like to reserve five minutes for rebuttal, but I'll watch my clock. There are many reasons that the court should remand for a new trial in this case, but unless of course the court has questions on any other issues, I'd like to focus in on three in particular today. First, that the government did not need its burden to prove the good faith reliance exception to the exclusionary rule was met in this record. Second, the government did not establish that probable cause existed to arrest Mr. Little eight hours after the murder without a warrant. And finally, briefly, if time permits, I'd like to address the erroneous admission of the remote and dissimilar prior act evidence under Rule 404B. Turning first to the good faith reliance issue, this court should just apply the rules set forth in Pemberton's most recent published decision on the matter. And the timeline is crucial to distinguish why the outcome at Pemberton is the way it went and why the government under Pemberton did not need its burden in this particular case. Pemberton held that the warrantless actions by the state officers in that case met that the government had proven that the good faith reliance exception could apply to the warrantless conduct there, because there was, quote, no clear precedent, quote, expressly contradicting the longstanding practice of Oklahoma state courts to assert jurisdiction over the land at issue. And that made sense, because that was in 2004 when the state conduct occurred. But here, this court had issued Murphy by November of 2017. I do agree that Pemberton's distinguishable, but what about our more recent Bailey case that had a different fact pattern than Pemberton and is more contemporaneous than that case was? Yes, Bailey, the unpublished most recent decision from this court on touching on these topics is also materially distinguishable for a different reason, that at issue there was a single warrant to seize and search a phone. There was no warrantless conduct in Bailey. And so this court sort of applied the traditional Leon exception to, you know, that if officers are relying, it's a, it can be a warrantless conduct. It can't be objectively reasonable for officers to rely on a search warrant issued by a magistrate. And so this court affirmed the denial of suppression in that context. In fact, Bailey, I mean, I was struck by how often Bailey referenced the requirement, not requirement, but the fact at least of relying on a magistrate's decision. Yes. And you're right. We don't have that. Yes, Your Honor. We have sort of the exact opposite scenario. We have a warrantless arrest of Mr. Bailey on February 2nd, 2018. Then we have interrogations occurring that night. Then they go to his house and search it without a warrant while at the same time executing warrants to seize and search his truck that they had obtained based on a lot of information from the interrogation. So that warrantless arrest really taints everything that officers learned in this matter and was in fact the reason, you know, the main thrust for why they established probable cause in front of the magistrate to get the truck. So Bailey is not on point, but it does show sort of how the nuances and the very specific timing and whether there was a warrant or not, you know, really dictates the outcome in these cases. And that's why... Hadn't there been some Oklahoma State Court decisions that were contrary to the Tenth Circuit's Murphy case? In other words, disagreeing with the establishment of the Creek Nation. And, you know, we're here looking at trying to evaluate good faith practices by law enforcement. And what do you do in a circumstance where there may be some dispute between the federal courts and the state court on a key critical fact here about where the boundaries of the nation was? And certainly Murphy, you know, I followed that pretty closely. The mandate was stayed and it went up to the Supreme Court and they tied and then McGirt came along, you know, the following year. So it had a very convoluted procedural history. You know, should every reasonable law enforcement officer in Oklahoma had, you know, kind of believed that they lacked jurisdiction to conduct this investigation? And interrogation? Yes. At the time of the conduct here in April of 2018. Because it was after Murphy. That's dispositive for your position. Yes, it was after Murphy, but it was well before the state McGirt decision that eventually the Supreme Court granted cert on. That decision was February 2019 was the state Oklahoma Criminal Court of Appeals decision. And then the Supreme Court grants certain December 2018 on that McGirt decision. And for what it's worth, Supreme Court grants cert in Murphy in May of 2018. So again, still after this April 2018 conduct. So I do understand there are scenarios where there can be sort of nuanced factual differences that allow the government to invoke. And prove good faith reliance and not. Don't we have a problem with the nature of pouring a vacuum to, though? You're kind of arguing that it was wrong to infer. That this did. It was wrong to assume that it did vacate the state. But by the same token, the other side is probably would have been equally wrong to infer that it didn't. We just didn't know. I mean, so there was a true vacuum. I mean, neither side really had a strong case for inferring that their position was going to be right. Did we have a time then when the state simply nobody had jurisdiction? Because if the state had jurisdiction, the feds wouldn't. And so are you suggesting that we should have had this time when when simply it was lawlessness out there, which I guess is not an uncommon situation there. But in Oklahoma, it's early history. But no man's land. No, Your Honor. I think that actually the situation your honors identified was present in 2004 and before Murphy, where there maybe it was a complicated decision. There was nothing from the state courts or this court or the Supreme Court deciding this disestablishment issue. But once Murphy hits and then the state conduct occurred, yes, this court's case law is clear that law enforcement is presumed to have a reasonable understanding. Well, the district court said until the mandate was issued, there was enough ambiguity where law enforcement could not infer that Murphy was definitive. What's wrong with the reasoning of the district court? Two things, Your Honor. First, that there's no legal precedent. I traced back all the cases that have come out of Oklahoma federal district court that say that no one's citing to any legal rules that would have this unique interpretation of the mandate of its effect on binding law as opposed to just a jurisdictional matter in that case. So that rule doesn't exist. And I guess that leads to my second point, which is that the good faith reliance exception requires law enforcement to rely on something in good faith, even if later it turns out, oh, we were wrong. And we just have the opposite here. There's no state court decision that existed in April 2018 that the government's identified or that I've been able to find or that's been cited in the numerous cases before this court. Is there authority that goes the other way on the mandate rule issue that says law enforcement is required to endorse a case before the mandate comes out? No, this court has never. So two things. So this court has never recognized that the mandate has any effect on legal precedent and instead correctly identified it as a jurisdictional vehicle, essentially marking the end of jurisdiction of this court to then spread the mandate. You know, it seems to me that we got a little bit sidetracked on that. The briefs did sidetrack this. I didn't think the key was so much that the mandate hadn't issued yet, because that seems quite administrative. But to me, the key is that the Supreme Court had held this case while it was deciding McGirt. And yes, the mandate was restrained because of that. But that did inject uncertainty. When the Supreme Court takes one of your cases and takes cases from all over the nation and puts them on hold, they are just telling, screaming to the world, we may reverse all of you guys. And that's why we're holding it. So yes, the way we responded to the Supreme Court holding it was to defer the mandate. Why? Because the message was clear. When the Supreme Court holds a case for some other case that they're considering, most lawyers I know would say, oh, those cases aren't long for this world. That might be true. But the Supreme Court did not accept cert in Murphy after the conduct. Oh, I'm sorry. I apologize. I jumped in too quickly. Say it again because I may be mistaken. Sorry, Your Honor. The Supreme Court held the case in May of 2018 and the conduct here occurred in April of 2018. So we are talking about a short period of time where Murphy was the binding law, no doubt. And then if the cert grant is significant to this analysis, that didn't occur until after the conduct here. So again, if we're looking for something and the government has to identify something that law enforcement actually relied on here to excuse this violation of Mr. Little's Fourth Amendment rights, we don't have anything to point to in that brief time period between November 2017 and May of 2018 when cert was granted in Murphy itself. We've monopolized your time a little bit, but I would like to hear about your probable cause and prior acts argument also. Absolutely, Your Honor. So just quickly because I think it's briefed in detail and it is obviously totality analysis on the probable cause that I could spend hours on. But there's two crucial problems here. And the first is that the trial testimony from the lead detective contradicted the pretrial testimony about what actual surveillance evidence they had and whether it showed a truck resembling Little's with this identifying sticker or not. And the trial testimony says they only had the still photo from that aquatic center parking lot. It's extremely grainy. It's in the record. We submitted it to the court. That testimony is the volume one at 636. And the reason why I flagged that and we spent time on that is that the surveillance that there was surveillance that purportedly tracked his truck around the area and sort of showed mapped out that he could have been the one driving to where the railroad tracks were and then back. That was really crucial to the district court's probable cause finding pretrial. And then it just these conflicting facts were just not addressed when the issue was renewed at trial. And so on this record, there is not a set of findings or on contradictory facts that established probable cause on that crucial matter. Do we have to disregard the finding about the rifle and ammunition and so forth? Because all of that was was predicated on the initial warrant, which was predicated on this. The so the fruits of the arrest, whether it was without jurisdiction or without probable cause, whichever analysis the we can't rely on all the weapons and so forth. It was later discovered. Yes, they're all fruits. There's never been indistinguishable, but it's his interrogation. So there was nothing except the identification of the truck in the green. That was the only basis for the further government action. Is that what you're saying? I'm saying that at the time they arrested him, which was eight hours after the shooting, they did not actually have all of this surveillance evidence that they presented. What else did they have other than the truck? Other than that, they had just a grainy surveillance video that showed a white truck in Oklahoma near this parking lot near the area. And then they had conflicting and vague statements from people who came to the station and that they had phone interviews with about maybe there were threats between the two. But our friend, his name is Landon. In the record, he has screenshots of it. But then when they spoke to that man, he said there was a, quote, conflict between the two. There was never dates, details, specifics to show that this was the nature of this conflict, if there was one. But they had several people that had said there were conflicts between the two. I mean, didn't they have two or three people to say, look at him. If you're worried about who shot, there's the guy to talk to. So there were two people and they were, the record only shows that they speculated, oh, maybe it was Mr. Little, just as Ms. Watkins said. But Ms. Watkins also, because this is a totality and we have to consider what establishes probable cause or might mitigate it, Ms. Watkins also said, I never heard of any conflicts between the two. And she's obviously the most connected to both. So we have maybe some indication that needs further investigation of maybe a dispute between the two. But we are not at the level of probable cause to arrest someone eight hours after this murder when the government hasn't done its due diligence and the state officers didn't do their due diligence and actually follow up on these leads to see what had been said and when to see if that established that he was guilty of this murder. I know your time's up, but I do want you to comment on the prior acts. Yes, absolutely. The reason this case is unique from most of the cases where this court affirms, I do understand it's a discretionary standard, but the reason this case is different is because the conduct here is both dissimilar and remote. And as I reread all the cases cited by the government and by us, one of those things isn't true. Either it's a situation where there was a meth buy a year before or trying to buy a kilo of meth a year before and then being found a year later with a kilo of meth with some distribution evidence. So that prior contact could come in. So maybe there's a long gap, but it's just completely on point situation. Or if there's different players like in I'm sorry, in But it goes to, they're introducing the show motive and a pattern of jealousy and arguably violent statements and those sorts of things. Why wouldn't that be within the trial court's discretion to admit that for that limited purpose? Because that's just the purpose identified and there still is the requirements of some similarity that's the linchpin of the analysis. And again, it does not have to be identical, but especially when we're getting to years before this is allegedly happening, this is completely different conduct with three different men and the government you know, the facts that came out at trial, just nothing was similar to the actions here. And because there was different people involved, there's just, there's not one case site in the briefing where it's similar for the information that came in. This one went a far field and it just wasn't similar. Why isn't the key issue similar? The key issue is somebody beats his old girlfriend and he was violent about it. That was common among all of them. At least he was making threats or was suspiciously acting. You don't need anything more common than that, do you? Yes, you do and the case law in that just because it was helpful for the government to establish motive and gave a good theory, doesn't mean that it still meets the similarity in the actual conduct that's alleged. And the conduct here was very different and it was going to someone's house and saying, I tracked your phone. It was allegedly cutting brake wires when Miss Watkins would have been in the car, which doesn't really make a lot of sense if he wants to be with her. And then the third incident of sending new photographs to her current boyfriend at the time that she was also with Weatherford. So just none of those things are similar enough. They really do cross the line into just pure propensity that yes, he acted jealous and had a motive maybe based on these facts, but it should never have come in because it's not similar enough. It doesn't meet the threshold standards of some sort of similar conduct. Thank you. I appreciate I'll give you a few minutes rebuttal also. Good morning. May it please the court. My name is Stephen Bryden. I'm here on behalf of the United States. I'd like to start with some of the issues that the court just discussed with my colleague. First, I had one point about the jurisdiction that I think didn't come up in the conversation that I wanted to make sure that I highlighted. When the government is referencing Bailey in the 28 J letter, what we're really talking about is in Pemberton, the court's looking at all of the historical circumstances, the legal landscapes and the prevailing practices in 2004. And then the question that is posed by Bailey is did Murphy change the analysis of those three things in the state of Oklahoma prior to issuing the McGirt decision? And what the court is going through in that analysis, while for sure they are relying on the fact that the magistrate agreed, they're still discussing that those same historical conditions, that same legal landscape, that area of confusion is still present. And so thus, it is not inappropriate for, in that case, the magistrate or the officers to rely on the magistrate's determination that it was appropriate. But again, that would extend with the exact same force to a law enforcement officer who, you know, what happened with Murphy and ultimately McGirt is a sea change in prosecution that is something that's not really precedented by anything else obvious in American history and required an entire retooling of how the criminal justice system worked. And I think this court recognized that in staying Murphy. And then the Supreme Court took multiple opportunities before receiving people to actually come to a final decision about what that did to the effect of jurisdiction in the state of Oklahoma. You know, I was a little, I expect I've missed something, which is why I'm asking you to tell me what it is. But it seems that this prevailing opinion kind of evolved just from the tradition of everybody and their assumptions. Often when you talk about a prevailing law, there is a keystone case, a major controlling case that everybody relies on. Apparently we don't have that here. It's just the way people believe. Is that right? I think that's fair, Your Honor, to some extent. Isn't that a bit unusual? Usually prevailing law, you trace it back to some defining case. And I didn't see that here. I'm not aware. At some point, reading through the history of McGirt, as they lay out, the state of Oklahoma took over prosecution of these offenses in Indian country. They just did it? They just did it. And for 90 years or 100 years, it really wasn't called into question with any frequency. And it wasn't until, you know, and there were a lot of very intelligent defense lawyers, prosecutors and judges who sat on the 10th circuit in the state of Oklahoma at the time. And it just was not something that people argued. But ultimately, when this court came to the correct decision in Murphy and when the Supreme Court recognized that in McGirt, that obviously was a significant change. But expecting line police officers from the Jenks Police Department in the two or three months after Murphy is issued with a hold of its mandate to recognize that it's a sea change to how everything needs to be handled in the state of Oklahoma is something that both, you know, you can see as a through line through Pemberton, through Patterson. Why shouldn't police you know, Murphy came out? Their lawyers can read it. It said no jurisdiction. I mean, yeah, it's a sea change. But why why shouldn't we expect local law enforcement to acknowledge the force of our decisions and, you know, follow the reasoning of that and to disregard it with question their their good faith? I mean, it's kind of a bright line, but it's a pretty good bright line. I agree, Your Honor, that line police officers are expected to recognize the court and apply them as they can. But I think even in, you know, conversations where this would come up in another circumstance, it's not necessarily assumed that on the moment of they're going to get everything correctly. And especially when something is so significant as this. And there is the state of Oklahoma has had this authority for a long time and this court by staying the mandate, you know, at least would appear to individuals in the state of Oklahoma. And they acted on that appearance both in the court system and in the law. They were just hoping it was wrong. I can't speak to to what they thought or what they hoped. But that is how everybody act. Do you think the so it's legally significant that the mandate had not issued in your view? I don't think it's dispositive either way, Your Honor. As counsel noted, and I think this court noted, I'm not sure that there's case law either way. Certainly nothing that I found. But when you're talking about again, you're putting yourself in the or the you're talking about the reasonable officer, whether the reasonable officer is going to understand that he needs really needs to do something that is contrary to this training and understanding when that decision is stayed. That's a piece of information that weighs in favor of the officer's good faith and not something that would weigh in favor of him having to make. So who I mean, it seems to me the most realistic assumption would be that at the time of this event, a reasonable officer knowing that Murphy certiorari was up there that the stay occurred. I mean, that the mandate hadn't been issued. I don't know that a lawyer would be able to say reasonably that the law is going to change or it's not going to change. All they can say is it's it's being reexamined. Who wins or loses if that is the only extent of what is reasonable? The officer says, I can't know that my conduct here is going to be wrong. I just know that it's going to be reexamined at that point. Doesn't doesn't the officers win that I'm not acting contrary to clearly established law and ambiguity? The officer wins in an ambiguity case, doesn't he? Yes, Your Honor. And that's what the court pointed out in Pemberton when it was going through the analysis is that one of those big factors is, is there a clear statement of law from the Tenth Circuit or the Supreme Court and the kind of morass of circumstances around this issue made it so that it was not a clear statement of the law. That's the only reason that Bailey can come out the way it does as well. If it was a clear statement of the law, then the Magistrate and Murphy also shouldn't have got it wrong. Magistrate and Bailey. Oh, I'm sorry, Your Honor. You're correct. The Magistrate and Bailey. I apologize for that. And so ultimately, considering that legal landscape, we believe that the good faith was appropriate. Moving on to probable cause, I think something that is important to note is that probable cause to not have to excuse all other possibilities or probabilities when you're looking at an officer's determination of probable cause. Number one, to address the inconsistent or allegedly inconsistent testimony we've put out in our brief with specific citations to testimony in the suppression hearing, the officer testified that the police officers as a group had been canvassing, they had been looking at surveillance video, and that they had been speaking to witnesses. And this is all prior to arresting Mr. Little. And then there are specific questions because it was what was at issue in the suppression hearing about exactly what they had seen and what they had before they went forward with the arrest. And what they testified, what the officer of Brown, now Chief Brown, testified to was that officers had seen the surveillance video. The only things that she had were the two still photographs from the surveillance video. In trial, there was no need to go through that testimony with that level of granular nature about exactly what she had when or where. It wasn't a suppression issue anymore. She reiterated her testimony that what she had at the point that they brought him into custody was the still grainy photographs. But she also makes statements that officers had been looking for a specific vehicle that stood out when they were looking at the surveillance video. That's her testimony. It's on 633, 634, and 636. She also talks about, again, having that conversation about the canvassing when they were looking at the videos. Is that grainy photo enough to link it to Little? You have a photo, and then the statements from the various witnesses, people that knew the background, there really wasn't anything specific other than a suspicion that he was the guy because he was a jealous type. I don't think any of the witnesses had any direct evidence, did they? It was all speculation, conjecture at that point. Maybe later there was more, but it seemed at the time of the arrest, there really wasn't a whole lot, was there? Well, there's a lot more than that and what counsel talked about as well. Just on the grainy photographs, again, there's also a witness statement where they identify the white truck with the sticker and they talk to Ms. Watkins before they make the arrest. Ms. Watkins identifies Mr. Little's truck. While you can't necessarily say for certain from the grainy photograph that that's Justin Little's truck, if you have a guy on scene who says, I see a white truck matching that description with the sticker you see in the photographs, the white truck, and then you have Ms. Watkins saying he's got a white truck with a sticker, that's actually pretty compelling evidence of probable cause that he's present. Then what Ms. Watkins, the discussion just now was that Ms. Watkins said, well, I don't know why he would do it. If you look at what we cite in our brief, her testimony is a lot more direct than that. Her testimony is that she doesn't know anybody else who would have a motive to kill Mr. Weatherford other than Mr. Little and that essentially he's capable of doing it and that he's always armed, that he always has a firearm with him. In addition, you have the statements that you were just discussing from other people who had specific knowledge, whether they did not convey the specifics of it to the police at that time, they came and said, look, you need to look at Mr. Little. He has a history of threatening stuff directly to Mr. Weatherford. When you're looking at that probable cause determination... They arrested him before they had the rifle. He's in the vicinity. He's arrested for first degree murder, right? He's arrested for Oklahoma State first degree murder. But really all they have is that he's in the vicinity of the shooting and a potential motive. Well, it's a little bit more specific than just in the vicinity of the shooting, too. It is that they have him in the vicinity of the shooting at the exact same time as the shooting. They have the call from Ms. Watkins ahead of time where he says, hey, I'm 10 or 15 minutes out. It later turned out he was in the parking lot when he made that call. But he makes that call saying I'm 10 or 15 minutes out. And then we have him on the trail being in the location at the time. Because we have from those initial witness statements prior to the arrest, we know exactly what time the shooting was. And so it's not just that he's there about when it happens. He's there exactly when it happens. And what's the timeline of the interrogation? Was he arrested before and then Mirandized and then interrogated? Yes. As soon as they take him into custody at Ms. Watkins' house, Your Honor, he's taken into custody by multiple officers. He's put in cuffs. He's brought to the police department. So we don't argue that he wasn't in custody. He was read as Miranda Rights prior to beginning that interview. He gets arrested, I believe, about 8 o'clock at night. And so they have already had their meetings with all the officers who are canvassing, looking at video on scene, talking to each other. They've already talked to Ms. Watkins. They've already talked to those other witnesses who are coming in with specific information about the history between them, even if it's not specific information about the incidents themselves. Did the video show other vehicular traffic in that area at the time? Or did it just show the one Greeny truck? At the time, I'm sorry, all the series we have entirely or that time? Well, no, at that time or within a few minutes around that time. So ultimately, when they looked at all the surveillance video, that truck is the through line that they see. There are other vehicles on the road, but that truck is the through line between all of those different videos. It's actually traveling on the route from Ms. Watkins' apartment complex following Mr. Weatherford as he's walking down ultimately to the train tracks. It stops at the aquatic center, parks a place where it can't be seen behind a garbage container, and then backs out again and drives closer to the location where then you see the surveillance video where there is Mr. Weatherford and then being followed by the man in black or dark clothing. And then you see, again, that person running from that and then you see in other surveillance video in the area, the truck leaving. We know it went up through the toll booth which would have been on the way from where he was staying to Ms. Watkins' house had he actually been traveling the route he claimed he was. And then he ends up back at Ms. Watkins with his son. So the surveillance video ultimately is very compelling evidence that he was everywhere. He was alleged to be. And ultimately he himself in the interrogation, I know in the cumulative error argument, Appellant makes the argument that it's not even conclusive evidence that he was on scene from the surveillance video. He admits that he was there. He admits ultimately that he had followed him from the apartment complex. He claimed initially he was going to give him a letter because he was going off to be deployed in case something happened to him to tell him that he asked him to be a good step parent or whatever to his son. But then when pressed by the police, no such letter actually existed. And so there was, he puts himself at the scene very, very clearly himself. Could you comment briefly on the prosecutorial misconduct issue that was raised by Mr. Little? So there are a couple different issues or a couple different things they point to in the closing. First, the issue of whether or not saying somebody doesn't have, I see them out of time, but if I can answer briefly. When he's talking about Mr. Lackey not having a dog in the fight, he's not making an express statement about credibility or not credibility. The jury's given instructions that says you have to look at biases. You have to look at reasons why people may tell the truth and may not tell the truth. At that point, the prosecutor is giving them his best estimation and they ultimately have an instruction to tell them they need to rely on their own findings in making that decision. We agree and we stated so in our brief that the prosecutor did go slightly beyond the record in describing the statements that had come from the other individuals while in previous hearings we had discussed the content of those. They had not come out in the trial and so it was not inappropriate for the prosecutor to say multiple people had come to the police department after the shooting. However, it was a step beyond the evidence to say and that they all pointed toward Mr. Little. Although Ms. Watkins and one of the other individuals named did actually point to Mr. Little and ultimately we've cited some case law in our brief that says a straight comment like that is not something that should cause a case to be overturned absent of a showing of significant prejudice from that statement alone and considering the weight of the evidence on the other side that's not present here. Unless there are any specific questions, I would ask to uphold the decision. Thank you, Counselor. Could you give two minutes for rebuttal if you care for it? Thank you, Your Honors. Two quick points on rebuttal. The first to the good faith reliance issue. This court's cases, Gonzalez and Herrera read together do create a bright line rule that when officers are acting without a warrant they are reasonably they are presumed to have a reasonable knowledge of the law and that if there is a 10th Circuit decision on point that says what they're going to do is illegal, then good faith reliance does not apply. And Herrera is particularly instructive because it was a decision where this court had already determined that random stopping for administrative reasons was a different mechanism that they'd have to employ before just doing random seizures. And so the officer who then did that under that sort of complicated administrative law couldn't meet the good faith reliance exception because, again, what's missing is the reliance on what because the case law said you had to do otherwise. So for this very narrow period between November 2017 and May 2018, officers were bound to apply Murphy and respect this court's decision about jurisdiction. And because they did not do here, that exception has not been met on this record. And quickly as to PC to arrest him, the white truck with the sticker is not identifiable from that grainy surveillance still that was shown to Ms. Watkins. So that is not a fact that they had before the arrest. And Watkins also told Brown, the lead detective, that there was nothing out of the ordinary when she spoke to Mr. Little shortly after this. So, again, neither side can cherry pick which facts this court considers, but under the totality, it just doesn't add up to probable cause to arrest just a mere eight hours without more investigation. So thank you. Thank you, Counsel. We appreciate the fine argument. You're excused and the case is submitted.